Keystone Health Plan. I assume we have a room full of bronze fans here. Your chambers look so bare. Our chambers are filled with your papers. I figure that box is all over the place. Is it John C.D. or some more associate back in the office that has all the boxes? May it please the court, good morning, your honors. I'm James Martin for Highmark and John Browse. I'm hoping to start with a football analogy at least, but I don't have one. With the court's permission, I would like to reserve three minutes of my time for rebuttal. Also with the court's permission, my co-counsel would like to reserve two minutes of her time for rebuttal. I haven't been in the trial courtroom in a long time, but I read this. This seemed, if you take the possible spectrum of fees out of the case, this seemed like such an easy case to resolve. When you get everybody, you get the folks in Pennsylvania and the courtmen in Pennsylvania, you get the folks in Florida and the courtmen in Florida, the judges talk to one another. Why has this case gotten so difficult? You get judges talking to one another. It just seems like a very easy case to resolve. Am I missing something? Well, your honor, I think that both the parties would agree that they wish that the case was easier to resolve, but I think in the combination of things over the course of the litigation have made it more difficult, most specifically, your honor, the injunction that we're talking about this morning. Well, what I'm talking about would have happened before the injunction. There wouldn't have been a need for an injunction. The injunction took that away, but if you just get people together and the judges talk, you don't need any injunction. Your honor, I appreciate that. And I think that the parties in the courts would like to go in that direction, but it doesn't absolve the legal issue that I've got to argue this morning. And I appreciate the court sentiment. And certainly that is something that all the parties in the courts undertake to do in this situation. As our briefing makes clear, we submit on this record, though, your honor, that the injunction that's in place here, which conditions IMARC's participation in the settlement in the Florida mediation, is unlawful and outside the powers conferred on the court under the All Writs Act. And we understand, your honor, that the powers conferred under the act are broad. But as this court has said and many others have said as well, they are firmly circumscribed and restrained. All the courts considering All Writs Act injunctions also acknowledge the concurrent jurisdiction of the federal courts over respective controversies, even similar controversies, is the rule. Simultaneous adjudication is permitted. And it alone has never been sufficient to support the grant of an All Writs Act injunction. Consistent with that tolerance for parallel litigation, this court has never utilized an All Writs Act injunction simply to protect the interest in a certified class. Nor has it indicated that such an injunction would be appropriate. On the one hand, this court has clearly issued All Writs Act injunctions to protect settlement that MDL courts were considering or had before them. On the other hand, the courts refused to grant injunctions where there was no pending settlement before the MDL court. And settlement negotiations were advanced or taking place elsewhere. Mr. Martin, let me ask you this question because you can buy it up and save your time. You don't have a whole lot of time here. Would you agree that our review of the issuance of this injunction is an abuse of discretion standard? I would not agree with that, Your Honor. You would not agree with that? What standard do we use to determine whether or not the injunction was properly entered? I think there are two pieces to the standard of review, Your Honor. One which would involve the no vote review by this court and the other which indeed would involve an abuse of discretion. Okay. And I submit that under either standard we can prevail. On the de novo side, this court has made it clear that the court's legal authority to issue this injunction is reviewed de novo and we have demonstrated that it doesn't have the legal authority to do it. The court also reviews de novo the legal conclusions that underlie the injunction and we submit on de novo review the legal conclusions drawn by the court will not support the injunction here. Now, on the abuse of discretion side, taking all the facts that the court relied on and stirring them together, there is an abuse of discretion because those facts under this court's precedent and under existing precedent will not support the extension of an all-writs injunction to these facts. Where does it say, what case says that an injunction under the All-Writs Act could not be entered in a case like this? I'm going to add one other key factor where the Judicial Panel on Multidistrict Litigation already rejected your request to make this a tag-along action. Where is that case that says that the court's action here was an abuse of discretion? Well, the cases that suggest that the court's action was an abuse of discretion are this court's precedents in Carlo, diet drugs, and the gas tank cases. Also, because the court acted outside the confines of the managed care case and the lease oil case. Looking at what the Judicial Panel did, when the case was before the Judicial Panel, they were considering only the efficiency of joining the two cases together. They were not examining whether the cases had, in fact, factual overlap for purpose of this issue of concurrent jurisdiction of trying to settle. So the Judicial Panel's decision was not directed to this notion of jurisdiction that governs this controversy. And, in fact, it wasn't directed to entertaining any issues as to the All-Writs Act at all. We submit, Your Honor, that that's irrelevant to this determination. Now, on what the case law does say is that All-Writs Act jurisdiction is appropriate. When there is an MDL court confronting an order in another court or a settlement in another court, that is going to directly nullify its exercise of jurisdiction. But this is the flip side of that. This is not the MDL court issuing the injunction. This is the court enjoining the MDL. And that is why we are into the realm of there being no authority for this injunction. There is nothing here to protect except the certification of the class. And no court has said that that's sufficient to justify an All-Writs Act injunction. Back to Judge Fischer's question. I'm just a little confused. I understand where you want to go. You'd like a reversal. But isn't the determination of whether something is necessary and appropriate an abuse of discretion, a discretionary call? I mean, you're talking about authority versus, in the circumstances of this case, it may not be appropriate or necessary. But I'm a little confused by your use through your briefs of it doesn't have the authority to do it. I mean, the statute's there. Whether the judge made the right call or not is another story. I think, again, there are two components to that. Discretion is always exercised in accordance with legal standards. And if the legal standard has been erroneously applied, by definition, you have an abuse of discretion. Similarly, if you get beyond that to consider the facts, also there can be an abuse of discretion if the facts don't support the legal result reached. On the first point, people— Are you saying the injunction here is not agreeable to the usages and principles of law, therefore violates the All-Writs Act? In that sense, it's an abuse of discretion? Yes, and also in the sense that there is no authority under the All-Writs Act relative to the issuance of injunctions that would support the issuance of an injunction here, where there is no pending settlement to protect in the issuing court and where, in the reviewing court, no settlement has, in fact, taken place. But there is a settlement now. I guess there's a settlement that's been entered into in Florida. Correct. Which may or may not have an impact on the Grider action in Pennsylvania. That's correct, and Highmark is not a participant in the Florida settlement. We don't have a deal there. And second, as to the impact on Grider, what we submit should happen is the proceedings should go forward in Florida. The adequacy of the settlement should be determined there. However, if the settlement is approved, then its legal effect can come back to Pennsylvania for further adjudication consistent with principles of res judicata. What happens to any release that might be issued in Florida to Capitol or Highmark or Mesa City areas or affiliates? First of all, the Florida court indisputably has the jurisdiction to consider the release of the claims and to approve the release on whatever terms it determines appropriate subject to 11th Circuit review. When that is completed, then the terms of the release can be brought to any litigation by any other party here in Pennsylvania and determine what the effect is. But isn't it too late then? What happens if the Florida settlement, I don't know what it says obviously, but what if there's a release given in the Florida MDL action which releases Highmark and Capitol and its affiliates and subsidiaries, and the release is dropped to broaden it, because I'm sure it will be, to arguably encompass any claims that anyone may have had against Keystone. That release is then brought into the action in Pennsylvania, where Greider is pursuing this focus only on her claim against Keystone. She has no more claim against Keystone because the release in Florida basically absolves Keystone by virtue of its impact on the other company. For instance, the capitation claims, which are part of the Florida litigation. First of all, the settlement and release in Florida, as this court has said in Carlo and other cases, is no direct threat to any litigant in the Greider case because they have the opportunity to evaluate that settlement and opt out. And that is the due process right that's conferred there. Now, if the release is as broad as suggested, and if it includes the capitation claims, when we come back to Pennsylvania, we will litigate the legal effect of the scope of that release. The district court will have the opportunity to determine whether it is a defense to anyone who did not opt out and wants to continue to litigate. And under those circumstances, Your Honor, the court would review it. It would take the facts, it would compare the claims, and it would decide. Now, are we inviting the court to construe the release narrowly? No, we're not. But that litigation should take place at another place in time, not interfered with by this injunction. And certainly the speculation that we might get a release that's broad, which, by the way, we don't have, can't support the issuance of an injunction now. Has anyone gone back to the district court judge in Pennsylvania since the order says you're enjoined from acting to settle any case in any other form without the express approval of this court to go back and say, look, there's a deal in Florida. Now, can we be involved in that communication? Which would probably make Judge Moreno very happy to get him in there. We have gone back not once but twice, Your Honor. We went back for a lifting of the stay when the Florida deal was announced. That was rejected. We went back again after the Florida deal was consummated. And our participation, or we were not going to be given the ability to go to Florida to participate in the settlement discussions unless we agreed that the Grider claims would be carved out. I just want to clarify one thing, Mr. Martin. That injunction, as it presently stands, only bars you from being at the table in Florida as it relates to the Grider plans. As it relates to needing the approval of court. That's right. For what they described as the Grider claims. Okay, so if you want to be at the table to settle the claims of providers outside of Keystone Central, you could do that. We could do that, Your Honor, but we maintain that the constraint itself is unlawful. That we should be able to participate in the discussions there unfettered by any constraints. And that there is no authority under the All Wrights Act in particular to put that constraint on us. Mr. Martin, thank you very much. Is it soy or soy? Soy. Soy? There are two O's, though? It sounds like one O, but there are two O's in there? Correct. It has two O's, but it sounds like soy sauce. That's what I always tell people. Good morning. May it please the court. I'm Kathleen Soy, and I'm here on behalf of the appellants in the 1231 case, Capital Blue Cross, and its former CEO, James Meade, and Keystone Health Plan Central, and its former CEO, Joseph Pfister. And I'm also here on behalf of the appellants in the 1270 case, Crowley Mooring, my law firm, and its attorneys. And as Mr. Martin mentioned, with your permission, I'd like to reserve two minutes of rebuttal time if necessary. We haven't received a brief from anybody here in the past few days, which is odd, but is there anything else we should know? I do think we've covered a lot of these issues sufficiently in the briefing. Factually, has anything else happened? No, there have not been. I think with the final round of supplemental briefing that our friends at Highmark filed, you've been brought up to date on what's going on in Florida. And so I'll just add a few points here. I think Mr. Martin has covered very well that there really is no legal precedent in this circuit or anywhere for the district court's injunction here, which essentially prohibits us from participating in settlement activities in the Florida case. The Pennsylvania court does not have exclusive jurisdiction over these claims. The law is very clear that there's concursion. Should the district court judge in Pennsylvania, from your perspective, what should he have done? He's concerned that there's MDL litigation going on in Florida that may have an impact on one of the defendants, at least one of the defendants, in the action before him. What should he have done? Well, I think the law is clear that both courts have concurrent jurisdiction. And really, the normal course is to allow both courts to proceed with their cases. So the best thing the Pennsylvania court could do is to let its case proceed to bring it to some conclusion in the form of a judgment, whether that be a settlement or a trial. And if he gets to that judgment first, then that is taken to the Florida court to see what its effect is. If, on the flip side, the Florida court proceeds more quickly and a judgment is reached as to these parties there, the opposite thing happens. And that's the very strict course that the courts allow. And what's happened here is that that's been turned on its head, and the court is attempting to use the All Writs Act to bring injunctions, basically prohibiting all of the parties from participating in the settlement discussions that are going on in Florida. And as you all know that some companies have actually reached settlement in Florida. None of the companies that are here before you today are part of that settlement. And Mr. Martin mentioned the time mark is not, and I want to make sure it's clear that the clients we represent also are not part of that settlement. The reason for the tag-along being denied was because the Pennsylvania case was three years more advanced. Is that the only reason? That's correct, Your Honor. What the JPML does is it evaluates two components, really. One is whether the cases have facts in common, but it also looks at a second component, which is is this the most efficient way to handle this stuff. And we believed that the cases did have common facts, common claims, and really all should be consolidated in the multidistrict proceeding in Florida. Is there a capitation claim in Florida? There were capitation claims in Florida. Are there now? There are not now. So that would be a difference, would it not? That is a difference between the two actions, but we don't think that that's important to the authority for the injunction here. Would they survive? Would they survive a settlement? Would a capitation claim survive a possible settlement in Florida? Well, I think we would end up having to look at the release that could be entered into in Florida to determine what claims are dealt with in any settlement there. I think as you all mentioned earlier, you noted that in the settlement that's been entered by other parties, again, not our clients in Florida, there is a release of capitation claims. And as you all know, you can settle claims that are broader than the claims that are brought in the lawsuit. So it is possible that capitation claims could be released in a settlement in Florida, but it's all speculation at this point because there is no settlement. But the Grider plaintiffs also could object to a release that released the capitation claims and ask for a more limited release for your clients, could they not? That's absolutely correct, Judge Fischer. You are on the right track. I mean, what our argument is is that their rights can be protected by the Florida court. There was just recently a preliminary approval hearing in Florida on the settlement that's now before the court. There were numerous lawyers from cases somewhat similar to the Grider case who appeared at that hearing and who put objections before the court about the scope of the release, the very issue that we're discussing here. The plaintiffs' counsel and Dr. Grider had the exact same opportunity. Those are the protections that are given to them under Rule 23. They can go to the Florida court. They can say that it is inappropriate to have a release that is broad enough to sweep in the capitation claims, for example, that they've been litigating in the Grider case. Also, the scope of time is different in Pennsylvania too, right? That's absolutely right. The class periods are different. One goes from 1996 to 2001. That's the Grider class period. And then in the Thomas or Love case, the name changed as the cases proceeded. The class period goes from 1999 through the date of preliminary approval. Just to be clear, I mean, assume that the objections are made and the release that's out there is eventually accepted. If we were to vacate the injunction now, plaintiffs could opt out, right? Absolutely. Again, those are the same. You all clearly see that those are the protections that are put in place by Rule 23. They can remain as class members and come in and make an objection to any term in the settlement, not just the release. Or they can simply choose to opt out. That's another protection that's afforded by Rule 23. They can say, we don't like this deal. We don't want to be part of it. We're going to go and pursue our case in Pennsylvania. They absolutely have the right to do that, and that is the protection that the law gives. I know I'm out of time, but I wanted to make one very brief point, with your permission, about the sort of second appeal, which is on behalf of my law firm, which I think is a further reason beyond the ones that Mr. Martin and I share in common. This injunction order, you know, we take the position it was entered without authority, but it also, as entered, is extremely overbroad and imprecise. It prevents our law firm not just from taking actions on behalf of its clients, Capital and Keystone, who are the parties in the Greider case, but it also prevents us from taking any actions in terms of the settlement activities on behalf of seven other companies that we represent in the Florida case. Those companies have absolutely nothing to do with Greider. How does it go that far? Pardon me? How does it go that far? Is it because it can't be there? Well, what the actual injunction decree says is that we are not allowed to settle or even attempt to settle any of the claims that the Pennsylvania court says is before Greider. It doesn't limit it to on behalf of Capital and Keystone. It just says settle or attempt to settle any Greider claims. So to the extent the claims overlap, that order prevents my other seven companies from being able to be at the table and achieve a comprehensive global resolution of all of the claims against them in Florida. And so for that additional reason, we think that this injunction is overbroad and should be vacated. Thank you. Thank you. Good morning. My name is Ken Jacobson. I represent Dr. Natalie Greider, her practice, Kutztown Family Medicine, and a certified class of 6,000 doctors from central Pennsylvania in their claims that have been litigated before this district court for five and a half years and which are approaching trial. Mr. Jacobson, how does the MDL system function in this context? If you have not the MDL judge but another judge enjoining a basic injunction, which may, it looks like it hasn't, but it could have, torpedoed or undermined the resolution of all the MDL claims in Florida. That hasn't happened, I understood. But in theory, it could. Thank you. Judge McKinney, I think the operative word there was all the MDL claims in Florida. This Greider case and the claims are not in Florida and never have been. As Judge Fischer pointed out, the panel declined to transfer the Greider action to Florida. It's true that it was more advanced, but it is also true that the panel only said it shared some general facts, just as many other cases that were not transferred to Florida that are, for example, pending in state court. There was a case here against Independence Blue Cross before Judge Shepard was not transferred to Florida. This seems different because here you've got in Florida court-ordered mediation. You don't have a system where there's a concern about collusion or attorney getting together and cutting a deal that might result in unfairness like we have in some of the cases that have been cited to us. This is court-ordered mediation that is being impacted by an injunction issued in Pennsylvania, which is precluding possibly resolution of something in Florida. It's basically telling the plaintiffs in Pennsylvania, you can't be part of the court-ordered mediation in Florida insofar as it impacts these claims. And the defendant in Pennsylvania is arguably there, and I understand not directly there, not named, but is involved, it's interest or its take, in Florida, the defendant in Pennsylvania. Your Honor, the court-ordered mediation, Ken and Judge Gardner was very clear in this injunction decision to indicate that it was not preventing Highmark from pursuing the mediation that it was directed to pursue. And it was not preventing Capitol Blue Cross from pursuing the mediation. Judge Gardner said that five times. What Judge Gardner said was that in pursuing that mediation, you may not resolve and compromise claims that are exclusively before me, the claims of the Grider-certified class that involve Keystone. And it's a very important point because, Your Honor, this is basically jurisdiction one. It seems to me that those words are where the dispute is, exclusively before me. It seems to me, looking at this case, is that certain of the claims overlap, and that notwithstanding Judge Gardner's injunction, there are Grider claims before him, and there are Grider claims before the Florida MDL. May I address that, Your Honor? Yes. The claims before the Florida MDL have to do with Highmark's claims processing system and provider base, and Capitol's claims processing system and provider base. Those are the claims that are before the MDL, and that is what Judge Gardner identified in his injunction decision. It also talks about their affiliates. Your Honor, there is an attempt to sweep up subsidiaries. But, Your Honor, I would submit— In Florida. In Florida. But this is where we get back to jurisdiction 101, Your Honor. One cannot think of the havoc and mischief that would result if an enterprising plaintiff sued General Motors and all of its subsidiaries. Those subsidiaries are not parties down at that kind of litigation. That's what the language is here. The language is that subsidiaries have been pledged by— But if you're correct on that, it seems to me that at least part—and I'm not going to define the part—but at least part of the Grider claims are done in Florida. And if you're correct about what you're arguing, all your clients need to do through you is to go down and, one, either try to opt out of the settlement or object to the scope of the release. Your Honor, the Grider claims—none, respectfully, none of the Grider claims are in Florida. And that's what Judge Gardner found. The Grider claims involve claims against the Keystone HMI. They involve the claims— But Judge Gardner found that. But there's another competing judge of equal jurisdiction that has an MDL that has all the Blue Cross and Blue Shield plans as defendants and their affiliates and subsidiaries. And that judge could find to the contrary. Your Honor, that—the complaints down there, there's been no naming of Keystone in any of the complaints down there. That's understood. There's been no—there's no— And wouldn't you agree that Keystone Central is an affiliate of both Capital Blue Cross and Heimark? Keystone—I would agree that Keystone Health Plan Central was an affiliate of Heimark until three years ago. It's now an affiliate of only Capital. Of only Capital, that's correct. Capital is a defendant in Florida, and they've also named all the affiliates of all the Blue Cross Blue Shield plans in Florida. And, Your Honor, with all due respect, one does not assume jurisdiction. One cannot confer jurisdiction. One does not name a party under Rule 4, under Rule 8, under any of the joint rules of 1920 or 21. One does not assume jurisdiction over a Pennsylvania class and over a Pennsylvania local company from Central Pennsylvania like Keystone by saying, you assume your subsidiaries. It is—there is no jurisdiction over Keystone apart from the other factual differences between the claims, the three-year class period, the fact that there are no capitation claims, the fact that there are no prompt pay claims that are— Well, if you're right about that, if the Florida court has no jurisdiction over Keystone, then how is the jurisdiction in Pennsylvania in aid—how is the injunction in Pennsylvania in aid of the court's jurisdiction? Because the Judge Garner's jurisdiction—it was an injunction issued to prevent any kind of delay or mischief from being made down in Florida in aid of this district court's jurisdiction here over a certified class of Keystone providers and in a case that this district court has supervised for five and a half years. But how would that happen if the party, the main party here in Pennsylvania, Keystone, is not before the court in Florida? You make a good point in terms of minimal contacts and all that, in terms of getting jurisdiction. But then how is the Pennsylvania injunction aiding the Pennsylvania court's jurisdiction by ensuring its authority over an entity that is not before the court anywhere else? Because the threat of settling the claims or attempting to settle the claims or disrupting Judge Garner's ongoing management of this litigation to see it through to conclusion, which, by the way, this court has indicated that diet drugs is the standard under the Oral Rits Act. What is the criteria? Is the conduct that's being threatened disruptive of the district court's own path to judgment? This court has jurisdiction over Keystone. This court has jurisdiction over Capital. It has jurisdiction over Highmore. And the effort to try and undermine that jurisdiction by settling these claims or attempting to settle these claims in Florida is what led this court to properly and appropriately exercise that jurisdiction. It is that same distinction, Your Honors, that makes the opt-out remedy or the injection remedy in Florida really illusory. There is no jurisdiction over these claims as Judge Garner found in the Florida court. Well, if that's the case, and if there was no injunction, it seems to me that you could go down to the Florida court, make your argument, and the court down there would say, We agree with you. Your clients are not here. We're going to make it clear on the record, and we're going to allow them to opt out. Your Honor, the reason that the court, I think, entered the injunction and specifically indicated the lack of jurisdiction was concerned with the disruption of counsel and plaintiffs from having to litigate on two fronts. These are not claims that are pending here. But remember that whenever there's parallel jurisdiction, and especially now in this litigious world with toxic tort litigation flying around, that's the nature of a big firm practice almost. That's the nature of the litigation universe now. If there was parallel litigation, Judge McKee, and we believe that the defendants put the rabbit in the hat by describing this as parallel litigation when it's not. These claims are not down in Florida. There's no jurisdiction over the certified class of Central Pennsylvania providers. There's no jurisdiction over Keystone. So there really isn't parallel litigation. Well, yet the release, though, would probably cover it. The release, if it was permitted to go forward, would obliterate the Greiner case, which is why they want to run with Florida and, in the words of Lee Soyle, hijack this case. And Judge McKee, let me go back to what you started off with when you first questioned Mr. Martin. And it is, why haven't we been able to settle these cases? Well, the record is clear. I attempted to do that. But I intended to do that under very specific circumstances with the MDL cases involving the high mark providers and the capital providers could be settled separately with full knowledge of Judge Moreno and with full knowledge of class counsel in Florida, who might not, who might litigate the cases with. But the separate claims of Keystone would be negotiated separately, could be litigated separately under the auspices of Judge Garner, who has certified the class and is the only judge with a certified class who can approve any settlement of those claims. That was rejected because they wanted to go to Florida and settle the claims out. You only want to pay once, which is understandable. Well, they, they, they, they, one can only pay once. One could write one check. But that doesn't mean that one undermines jurisdiction and undermines the rules of pleading. And the best of court of jurisdiction, who has been overseeing this case for five and a half years in order to only write one check. I have no quarrel with them writing one check as long as they settle two cases. If it's big enough, I go to see you. Your Honor, two cases in two separate courts with the approval of those two judges. And that's what even Judge Garner says in his injunction decision. He even says, perhaps you can go down to Florida. But the plaintiff's inquirer have to have a seat at the table, meaning the certified class representative. And Judge Garner has to approve that because it's his class and it's his jurisdiction and it's only his jurisdiction. Mr. Jacobs, talk about the authority for the issuance of the injunction under the Albrecht Act. The authority is on the act itself, Your Honor. The authority of the act is very clear about the kinds of injunctions that can be issued. And the ultimate irony in this case is Judge Garner used Judge Moreno's own decision, own decision in managed care, when a rogue party from the MDL tried to settle a case out from under Judge Moreno in Illinois. And Judge Moreno issued an injunction under the Albrecht Act to prevent that settlement from going forward. It wasn't court ordered. The state discussions were not court ordered. And it was collusion that you don't have here. Unless I'm missing something. I don't see anything about collusion here. Your Honor, there doesn't have to be collusion. And it's wrong to put the Albrecht Act in a kind of narrow pigeonhole with these defendants. This court is recognized in diatrugs. And, Your Honor, you recognize it in the Prudential case. The Albrecht Act has been used in discovery matters. The Albrecht Act was used in the Wesch case with redistricting matters. The Albrecht Act has been used to prevent litigious plaintiffs from filing cases elsewhere. So the fact that the Albrecht Act has been used by MDL courts, such as diatrugs, in order to prevent state actions that might intrude on its jurisdiction is not a limitation on that act. That just happens to be the factual situation in which those cases arose. And I might add, Your Honor, that's what distinguishes those cases the way we distinguish them. Because in those cases, and, Your Honor, in the Monaco case, the releases have to arise from the identical factual predicate. That's the test. That's the standard. If you're going to be in one court, an MDL court, and release claims and then bar claims in another jurisdiction, Your Honor recognizes, citing a TBK case from the Second Circuit in Monaco, that the conduct has to be the same. The parties have to be the same. The parties aren't the same here. You don't get jurisdiction, and you don't name parties in Florida by saying subsidiaries. You have to name them under Rule 4. You have to assert claims against them under Rule 8. You have to have jurisdiction over them. You have to have minimum context for personal and subject matter jurisdiction. But doesn't that cut? That's an excellent argument. Doesn't it cut both ways? Because it means, though, that if any release is entered to and to in Florida, you can appear specially to challenge the jurisdiction or to challenge that release insofar as it may release claims against Keystone here in Pennsylvania. But, Your Honor, that would be disruptive. Judge Gardner found that forcing his class and forcing the parties before him. But it's just one named plaintiff. It's not that many plaintiffs. It is 6,000 certified class representatives, certified doctors. I thought this was one class rep. There are two class reps, Your Honor, a doctor and a corporation. The business as it was. But you get on a plane, you go down. How disruptive is that? Well, Your Honor. It's something you don't take at night after the article in the New York Times. It's unnecessary. It's unnecessary where a court doesn't have jurisdiction. It's unnecessary and respectfully inappropriate to compel parties, whether it's one or whether it's 6,000 doctors, to object to or opt out of a case in which there is no jurisdiction. And Judge Gardner recognized that. And if I just may follow up because I know the court asked questions about the standard of review. You're absolutely right. The standard of review is an abusive discretion standard. And within that standard, the findings, and Judge Gardner made extensive findings, can only be overturned if they're clearly erroneous. And there is absolutely no basis for any finding that any of the findings, in fact, here in Paramus, according to my record, were clearly erroneous. Thank you. Unless there are any other questions. Thank you. No, thank you very much. Mr. Fairbanks, do you have time, Mr. Martin? Thank you, Your Honor. From the standpoint of the jurisdictional issue that confronts this court, the jurisdictional issue is as to the All Writs Act, not as to the jurisdiction of the Florida court. Second, if broader releases for subsidiaries were not permitted in MDL global settlements, that would unravel a lot of this court's jurisprudence and expressions about what class action releases are appropriate. Third, there is no precedent that supports the issuance of this injunction under the All Writs Act. This court's closest precedent, the second decision in the GM gas tank cases, 132F3rd, refused to issue an All Writs Act injunction where the adjoining court didn't have a settlement before it, and the Louisiana court did, and it refused to issue that injunction in circumstances where this court had previously held that the attempt to settle the case was inadequate and it had reversed. It was incentivized to do it. Now, why didn't it do it? Because the powers under the All Writs Act are constrained. The so-called Carlo exception in this court, which protects MDL settlements, is the most expansive thing this court has ever done under the All Writs Act. As to the managed care and lease oil cases which were cited by the district court, there is no parallel in the facts of this case to either of those cases. And finally, the All Writs Act is not some omnibus piece of federal statutory law that allows courts to act in an ad hoc fashion where it's convenient. They can't do it where it frustrates and undermines existing statutory procedures, and this court is doing both here. The existing statutory procedures that relate to Rule 23 are what cover the adequacy of the Florida settlement. That can't be collaterally litigated in a district court in Pennsylvania, and this court has said so. The Florida settlement is almost a done deal in the way I could define it. It's very close to fruition. This is one of the little bumps in the road that's keeping it from being finalized. And again, if I'm wrong, let me know. Given this contingency, and I don't know what the language would be, but there's got to be a way of drafting the agreement that includes this outstanding Pennsylvania problem that's up there and makes allowance for that in resolving the Florida litigation tentatively contingent upon the outcome in Pennsylvania. I can't help but think, especially given the number of briefs we've gotten in this case, I can't help but think that this thing is not anywhere near as difficult as it appears to be. It's a two-part response to that, Your Honor. We can't start that ball if we can't go to Florida to participate in the mediated discussions. We don't have a deal there. We don't have a proposal. There is nothing close to final as to Highmark. So one leg of that, in terms of our pursuit, would be available if the injunction were lifted. And two, the ability to fashion some kind of global settlement here is the precise reason that this injunction should be lifted. It is interfering with that process in a way that the law will not substantiate. And if this court lifts it, then this process can unfold. That's the barrier. It was injected in here improperly and unlawfully, and it should be removed on the record that's before the court. Is this case, is this injunction holding up the settlement in Florida? It's holding up Highmark's participation in the mediated negotiations. It can't settle the claims on a global basis in Florida according to the allegations with this injunction in place. Okay. But not capital, because capital is needed in both places. Yes. Capital is not being held up. But capital is in these restraints as well on Highmark's part. Let me see your feet for a moment. Okay. Sorry. Thank you, Your Honor. You were picking up my point, and I'll just add to what Mr. Martin said. We have been frozen for months since this injunction was entered in January from working on achieving a global settlement. The injunction is standing in the way of not just our two clients in the Grider case, Cabell and Keystone, but our other seven Blue Cross and Blue Shield companies, everyone from Wyoming to North Dakota to HealthNow in New York. So it is creating an obstacle to getting that done. A few other brief points. Plaintiffs keep emphasizing five and a half years, but really this is not about the length of time that any case has been proceeding. What the courts require for this type of an injunction is a settlement or an impending settlement. And we simply do not have that here. You've seen no evidence on the record, and you've heard no one say that there is a settlement or impending settlement here in Grider. And therefore, there just is no precedent, either in the Third Circuit or anywhere, to justify this injunction. Second, these cases undeniably overlap. I think as Judge Fischer pointed out, all you have to do is look at the complaints. The claims overlap. There are very similar nucleus of facts involved. There are allegations of the complaint. In opposing discovery requests, I mean, you know, I wonder if judicial estoppel wasn't working. Nobody really is arguing it, but in opposing discovery requests, your response was, well, that's separate. They're not entitled to that discovery because it's very separate. And now you're saying they overlap. When they argued overlap to get discovery, they didn't overlap. At various points and under different circumstances, the parties have taken all kinds of positions about how these cases relate to each other. And I believe the reference you're making to a particular point was taken enormously out of context. You have to read the entire response and see the whole course of discussion there. But the cases do overlap. Despite what the parties or what the Pennsylvania court says, you need to go back and look at the complaints. And in those, you will see, as Judge Fischer was pointing out to us, that the claims overlap. And as Judge Chigueras was pointing out, that the classes overlap. The same Pennsylvania doctors who are in the Pennsylvania class are also class members in the national class in the Florida court. So it's important to keep that in mind. They're going to be deprived of some opportunities because of what's happening now. Secondly, there really is no harm and no interference, that's the word you see in the cases, to either the Pennsylvania court or to the plaintiffs in Pennsylvania from the activities in Florida. As we've already talked about, Rule 23 provides sufficient protections for them just like for everyone else. There are cases all over the country, in many states other than Pennsylvania. Rule 23 protects the people that are in those other cases. They can opt out if they want to pursue their own litigation. They can object if they don't like what the terms of the settlement, including the release, are. And they can even appeal if they don't like what happens before Judge Moreno in the Florida district court. So the bottom line is, you know, what's the right outcome here? How can they appeal if they don't like it? If they don't like the ruling that they get in the Florida district court, when they go in and object, they then have a right to appeal that to the Eleventh Circuit in Florida. So what's the right outcome here? Well, if Keystone is not there, it's saying that they could appeal based upon Highmark and Tapple's presence. They could raise an objection to the fairness of any release, to the scope of any release, insofar as it involves Keystone and appeal that to the Eleventh Circuit. That's all correct. And, of course, our position is that Keystone, the conduct of Keystone, is present in that case. If you read the allegations in the complaint, it clearly brings in the plans that involve Keystone, because Keystone, as we've already talked about, is currently a subsidiary of Capital and at an early point in time. The software is different. One uses OSCR. One uses a different software. The downcoding, I'm assuming the downcoding is done because of something in the software. Is that a manual adjustment? Well, the allegation is that the computer software manipulates the code when claims are processed. But, again, if you go back to the Florida complaint, it alleges issues with a particular software. McKesson and other systems, right? McKesson, but exactly. It also says other comparable systems. And so that would sweep in the OSCR system, which was used by Highmark, the Tingley system that was used by Keystone, and any other system. And when you look at all of the Blue Cross and Blue Shield companies that have been involved in that litigation, there are tens of systems involved. It is not about one, any one thing processing system. So where we end up here is there's no settlement in Florida for these parties. There's no settlement in Pennsylvania. What should happen is the injunction should be removed. The cases should proceed without any injunction in place. And if one reaches a judgment first, then those things will be dealt with at that point. And that's really what's best at the end of the day, not just for the parties who are before you here, but for all the class members. It really should be up to them to decide where they want to resolve their claims. Again, thank you. Thank you. It's been a day of really finely argued cases. You don't see that very often. Part of the reason might be the influence of one of the most distinguished jurists in the history of Eastern Pennsylvania in Portland. So I'd like to know if you had any input in the quality of oral argument. I know you may have for your colleague, Mr. Jacobson. I'm not sure you did for them, but it was a very well-argued case. Thank you very much. Thank you, Madam Reverend.